# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |  |
|---|---|---|
| JULIE A. HOLLAND, | ) | |
| an individual, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | |
| 3M COMPANY, | ) | **COMPLAINT** |
| | ) | |
| *Defendant.* | ) | **[JURY TRIAL DEMANDED]** |
| _____ | ) | |

1.      Plaintiff Julie Holland seeks relief from Defendant 3M Company's pattern of discriminatory and illegal behavior against employees who hold sincere religious and medical objections to 3M's COVID-19 vaccination mandate policy.

2.       In October 2021, Defendant imposed an unnecessary, draconian COVID-19 vaccine mandate for all employees.

3.       Defendant refused to accept and accommodate Plaintiff's sincere objections to the vaccine.

4.       Defendant's unlawful actions left Plaintiff with the impossible choice of suffering a physical assault and uninvited invasion of her body by receiving the experimental and harmful mRNA COVID-19 vaccine, at the expense of her religious beliefs, bodily autonomy, medical privacy, and possibly health – or losing her livelihood.

5.       This Faustian bargain is no bargain at all and is precisely what is forbidden by federal and Georgia civil rights law.

1

6.      Defendant's actions violated federal and Georgia law by mandating an experimental medical treatment, failing to provide reasonable accommodations for exemptions, and violating the sacred rights of privacy and bodily integrity.

7.      Plaintiff respectfully implores this Court to order that Defendant comply with the laws protecting the rights of the citizens of Georgia against precisely such Catch-22 "choices."

## PARTIES

8.      Plaintiff Julie A. Holland ("Holland" or "Plaintiff") is a resident of Rabun Gap, Georgia. She was employed at 3M Company as a Client Success Executive, as part of the Client Care organization. She was subjected to discriminatory treatment and terminated because of 3M's COVID-19 vaccine mandate.

9.      3M Company ("3M" or "Defendant") is a technology company that manufactures health, safety, industrial and consumer products. As of 2021, 3M employed nearly 100,000 employees worldwide. 3M is headquartered in Saint Paul, Minnesota.

## JURISDICTION AND VENUE

10.      This Court has original jurisdiction over the subject matter of this dispute pursuant to 28 United States Code ("U.S.C.") Section 1331. Plaintiff seeks remedies under Title VII of the Civil Rights Act pursuant to 42 U.S.C. § 2000e et seq. and Title III of the Americans with Disabilities Act under 42 U.S.C. §§ 12181, et seq.

11.      Venue is proper in this District under 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

12.      An actual and justiciable controversy exists between Plaintiff and Defendant.

## FACTS AND BACKGROUND

**3M's Discriminatory Treatment of Plaintiff**

13.     Plaintiff worked as a Client Success Executive, as part of the Client Care organization.  Plaintiff was a home-based, remote employee.

14.     Plaintiff worked for 3M and its former owners for 17 years. During that time, she was a top performer.

15.      In September 2021, 3M mandated that Plaintiff become fully vaccinated for COVID-19 by December 8, 2021.

16.     The federal mandate was temporarily stayed and 3M's original December deadline passed.

17.     Plaintiff believed she would be terminated in early January, 2022.

18.     On January 22, 2022, an injunction was issued against the federal mandate, and 3M lifted their COVID-19 vaccination mandate.

19.     However, in March 2022, 3M reinstated its COVID-19 vaccination requirement.

20.     3M implemented a new deadline of May 18, 2022 for all employees to be fully vaccinated for COVID-19. If Plaintiff remained unvaccinated at that time, she would be terminated.

21.     Plaintiff held sincere religious objections to receiving the COVID-19 vaccines.

22.     Plaintiff submitted a religious accommodation and exemption request to 3M on October 21, 2021.

23.     3M requested that Plaintiff answer a series of questions to supplement her accommodation request. *See* Exhibit A.

24.      In response to one of the questions, Plaintiff quoted Exodus 15:26 - "If you listen carefully to the Lord Your God and do what is right in his eyes, if you pay attention to his commands and keep all his decrees, I will not bring on you any of the diseases I brought on the Egyptians, for I am the Lord, who heals you". *See* Exhibit B.

25.      Plaintiff stated, "I have prayed to the Lord My God for guidance on the covid vaccine and the Lord My God has expressly forbade it. My sincerely held religious belief compels me to follow His word." *Id.*

26.      3M denied her request, although Plaintiff is aware of other religious exemption requests that were granted.

27.      Plaintiff met with her supervisors in March 2022. She was informed that the only way to keep her earned long term incentives, which were valued at $60,000 at the time, was to die or retire.

28.      As a result, Plaintiff, with the understanding that she would inevitably be terminated from her position due to her decision to remain unvaccinated, informed 3M that she had no alternative but to retire. She chose June 30, 2022 as her retirement date so that she would have ample time to smoothly transition her clients, many of whom she had worked with for years, to another 3M employee. Plaintiff's proposed retirement date was approved by 3M.

29.      However, on May 4, 2022, Plaintiff was called into a mandatory meeting and put on administrative leave for failure to adhere to 3M's vaccination requirement. She was placed on paid leave for seven (7) days, during which time she was forbidden from speaking to fellow employees or accessing any 3M materials.

30.      On May 11, 2022, 3M contacted Plaintiff to inform her that they were still evaluating her case and she was placed on a second week of administrative leave.

31.      On May 17, 2022, while Plaintiff was still on administrative leave, 3M informed Plaintiff that they were going to allow her to retire but that she was unallowed to return to work effective immediately.

32.      On May 25, 2022, seemingly in error, 3M called Plaintiff and terminated her.

33.      At the end of May 2022, 3M also sent a letter congratulating Plaintiff on her retirement. *See* Exhibit C.

34.      Plaintiff filed for unemployment, but was denied because she was deemed as terminated from her job for not following employment rules.

35.      Plaintiff, who was 58 years of age at the time she was forced to retire, was likely denied seven (7) more years of employment with 3M. Plaintiff had no immediate intent to retire from her position.

36.      Plaintiff was never at risk nor put anyone at risk from COVID-19.

37.      During her entire tenure at 3M, Plaintiff worked remotely and from home.

38.      Plaintiff managed between eight and ten large customers. Prior to 2020, she only interacted with a customer once per month or once per quarter. Regardless, interaction with clients only occurred at a scheduled event.

39.      Plaintiff met customers at corporate headquarters; she was never required to enter healthcare facilities.

40.      Between March 2020 and February 2022, Plaintiff did not see any clients in person. During this time, she received the highest rating from customers that she'd ever

received, and higher ratings than all of her colleagues on the Client Success Executive team.

41.     Plaintiff saw clients for the first time post-COVID in March 2022, along with her Sales team, and Senior departmental leadership.

42.     None of her clients ever asked or complained about vaccination status.

43.     Plaintiff filed a discrimination complaint with the U.S. Equal Employment Opportunity Commission ("EEOC").

44.     Plaintiff received a Notice of Right to Sue from the EEOC on November 30, 2022. *See* Exhibit D. This Complaint has followed.

**COVID Vaccines Violate Plaintiffs' Religious Beliefs**

45.     Plaintiff holds sincere religious concerns surrounding the process used to manufacture the vaccines.

46.     Presently, all COVID-19 vaccines have made use either in production or testing of fetal cell lines developed from tissues derived from aborted fetuses (see excerpt below).[1]



47.     For example, the Johnson & Johnson vaccines used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[2]

---

[1] *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf (last accessed August 26, 2021)

[2] Are the vaccines made with fetal cells, Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-faq/are-the-mrna-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021), see also, Tennessee Department of Health, Fact v. Fiction: Johnson &

48.　　　　In an interview with WREG-TV, Dr. Steve Threlkeld, president of the medical

staff at Baptist Hospital in Memphis, Tennessee, acknowledged fetal cell lines used to

produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered

from an aborted fetus in the 70s or 80s and there are several of these cell lines."[3]

49.　　　　The Louisiana Department of Health likewise confirms that the Johnson &

Johnson COVID-19 vaccine used the PER.C6 fetal cell line, which "is a retinal cell line

that was isolated from a terminated fetus in 1985."[4]

50.　　　　As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293

was used during the research and development phase.[5] All HEK 293 cells are descended

from tissue taken in 1973 from either an elective abortion or miscarriage[6] that took place

in the Netherlands.[7]

**Defendant Cannot Show that Allowing Unvaccinated Employees to Stay Would Cause an Undue Hardship**

---

Johnson Vaccine(2021) available at
https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-johnson-johnson-vaccine/ (last visited
Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell
line).

[3] WREG, *State: Fetal cell lines, not fetal tissue, were used to make Johnson & Johnson vaccin*e
(March 5, 2021) available at
https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).

[4] La. Dept of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 21, 2020),
https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (emphasis added) (last visited Oct. 24, 2022).

[5] *See*, Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?*,
https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells, (last visited on Aug. 26, 2021).

[6] *COVID-19 Vaccine and Fetal Cell Lines.*

[7] *Ibid.*

51.       Defendant denied Plaintiff's religious exemption on the grounds that granting it would impose an undue hardship on Defendant.

52.       The only grounds for claiming undue hardship would be the claim that unvaccinated employees would pose a risk to their coworkers.

53.       Where (1) the COVID-19 vaccine is not effective at reducing infection; (2) the COVID-19 vaccine is not effective at preventing transmission, (3) natural immunity to SARS-CoV-2 is preferential to vaccine-induced immunity, and (4) the vaccine poses abundant health risk, Plaintiff not only poses no risk to fellow 3M employees but are themselves put at risk from Defendant's mandate.

***The COVID-19 Vaccine Does Not Prevent Infection or Transmission***

54.       The COVID-19 vaccine has been ineffective at preventing the transmission and infection of SARS-CoV-2.

55.       A study published in the European Journal of Epidemiology analyzing data from 68 countries and 2,947 counties in the United States found "no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases."[8] Nor was there a significant indication of "COVID-19 case decreases with higher percentages of population fully vaccinated." Rather, they found a "marginally positive association such that countries with higher percentages of population fully vaccinated have higher COVID-19 cases per 1 million people."[9]

---

[8] S.V. Subramanian, et al., *Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States,* European Journal of Epidemiology (September 9, 2021), available at http://doi.org/10.1007/s10654-021-00808-7.

[9] *Ibid.*

56.     Indeed, the vaccine has demonstrated *negative effectiveness* and could even increase the risk of infection.[10]

57.     Israeli data found that those who had received the BioNTech vaccine were 6.72 times more likely to suffer a subsequent infection than those with natural immunity.[11] Israeli data also indicates the protection BioNTech grants against infection is short-lived compared to natural immunity and degrades significantly faster.

58.     A paper published in *Eurosurveillance*, a journal published by the European Centers for Disease Control, documents a significant outbreak of COVID-19 among fully vaccinated patients and staff at a hospital in Tel Aviv.[12] At the time of the outbreak, investigators determined 238 out of 248 of exposed patients and staff had been fully vaccinated with Pfizer's mRNA vaccine. Ultimately, 39 out of the 238 exposed vaccinated people (16 percent) were infected, along with 3 out of 10 unvaccinated people - a difference that doesn't reach statistical significance because the unvaccinated group is too small. Of the infected, 23 were patients and 19 staff.[13] The staff all recovered quickly,

---

[10] Altarawneh, H., Chemaitelli, H., et al. *Effects of Previous Infection and Vaccination on Symptomatic Omicron Infections,* N. Engl. J. Med. 2022; July 7, 2022, DOI: 10.1056/NEJMoa2203965; Florentino, P., Millington, T., *Vaccine effectiveness of two-dose BNT162b2 against symptomatic and severe COVID-19 among adolescents in Brazil and Scotland over time: a test-negative case-control study,* The Lancet, August 8, 2022, DOI: https://doi.org/10.1016/S1473-3099(22)00451-0; *see* Nass, Meryl, COVID-19 Vaccines Don't Prevent Transmission, Severe Illness or Deaths, Data Show, *The Defender,* April 4, 2022, available at https://childrenshealthdefense.org/defender/covid-vaccines-dont-prevent-transmission-severe-illness-deaths-data/.

[11] David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection?* Israel National News, (Jul. 13, 2021), available at https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Aug. 26, 2021).

[12] Pinina Shitrit, et. al., *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*, (July 2021) available at https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2021.26.39.2100822#html_full text (last visited on Oct. 3, 2021).

[13] *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021.*

but five patients died and another nine had severe or critical cases. ***All were vaccinated***. On the other hand, the two unvaccinated infected patients both had only ***mild*** cases of COVID-19.

59.     A senior Pfizer executive recently admitted that Pfizer did not even know whether its mRNA COVID-19 shot stopped transmission before Pfizer began administering it to the public.[14]

60.     It should, therefore, come as no surprise that in their real-world application the vaccines have not shown that they are effective at stopping infection or preventing vaccinated persons from spreading the virus.

### Natural Immunity is Durable, Lasting, and Superior to Vaccination

61.     Natural immunity is robust, durable, and complete against all variations of SARS-CoV-2.

62.     There is strong evidence that persons who have been infected with SARS-CoV-2 and recovered are protected from future reinfection for over a year, and potentially have lifelong immunity – unlike vaccinated persons for whom boosters are already being recommended and administered.[15] However, Defendant wholesale disregards the relevance of natural immunity entirely.

---

[14] Pfizer did not know whether Covid vaccine stopped transmission before rollout, executive admits, October 13, 2022, *news.com.au*, available at https://www.news.com.au/technology/science/human-body/pfizer-did-not-know-whether-covid-vaccine-stopped-transmission-before-rollout-executive-admits/news-story/f307f28f794e173ac017a62784fec414

[15] *See*, Yair Goldberg; Micha Mandel, et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three month nationwide experience from Israel*, medRxiv (April 20, 2021) available at https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 (last visited on Aug. 26, 2021); *See*, also Jackson S. Turner; Wooseob Kim, et al., *SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans*, Nature 595 (pp. 421-425) (May 24, 2021).

63.     A bevy of epidemiological studies demonstrate to a reasonable degree of medical certainty that natural immunity following infection and recovery from the SARS-CoV-2 virus provides robust and durable protection against reinfection, at levels equal to or better than the most effective vaccines currently available.[16]

64.     Israeli researchers conducting a massive group study found exceedingly low reinfection rates for people previously infected with COVID-19.[17] More interestingly, the Israeli scientists found people who receive both doses of the EUA-approved Pfizer shot were up to *13 times more likely to contract the virus than those who were previously infected with the virus* and that "natural immunity confers longer lasting and stronger protection against infection."[18]

65.     Consistent with the Israeli research team's findings, the Cleveland Clinic found similar data supporting the strong durability of natural immunity. In June of 2021, the Cleveland Clinic released a study of 1,359 previously infected health care workers. Researchers found a reinfection rate of *zero*, despite some of the studied individuals having been around COVID-positive patients more than the regular population.[19] Not one

---

[16] *See, e.g.* N. Kojima; A. Roshani, et al., *Incidence of Severe Acute Respiratory Syndrome Coronavirus-2 Infection among previously infected or vaccinated employees*, medRxiv (July 3, 2021) available at https://www.medrxiv.org/content/10.1101/2021.07.03.21259976v2 (last visited on Aug. 26, 2021).

[17] *See*, Svian Gazit, et. al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, medRxiv, https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf (last visited on Aug. 26, 2021).

[18] *Ibid.*

[19] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).

of the 1,359 previously infected subjects who remained unvaccinated, had a SARS-CoV-2 infection over the duration of the Cleveland Clinic study.[20]

66.     The Cleveland Clinic researchers concluded: "***Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination***, and vaccines can be safely prioritized to those who have not been infected before." (emphasis added).[21]

67.     Given the mounting body of compelling research, it is medically unnecessary for persons who have recovered from COVID-19 and present evidence of natural immunity, to undergo vaccination for SARS-CoV-2. Indeed, it is beneficial for most individuals to be naturally introduced to the virus.

68.     Defendant knew or should have known of this early research at the time it implemented its vaccine mandate.

69.     Forcing Plaintiffs, who may have had natural immunity, to receive the COVID-19 vaccines would not only offer them or those around them little benefit, but it would also subject them to an elevated risk of adverse side effects, including death, as demonstrated below.

***Vaccination Poses Substantial Health Risks***

70.     All three of the available COVID-19 vaccines available in the United States are marketable under Emergency Use Authorization ("EUA") and based entirely on a limited set of clinical trials executed over a matter of mere months before vaccines were

---

[20] *Ibid.*
[21] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).

administered to the public. Recent information has revealed that these trials were riddled with massive fraud, falsified data, and negligent and intentional error.

71.     Though the FDA has approved the use of Comirnaty for future use, Pfizer has admitted that Comirnaty is not currently available to the public.

72.     There has never been a successful coronavirus vaccine in history.

73.     Governmental authorities revised their definition of the word "vaccine" itself in order to continue to label these experimental drugs with novel ingredients because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission, neither of which Covid vaccines can any longer claim credit for.

74.     Recent reporting data presents an alarming picture: as of the time of this filing, there have been 31,446 deaths reported to VAERS from COVID-19 vaccines and 1,591,545 total adverse events.[22]

75.     The input of event reports to VAERS since the COVID vaccines were rolled out is **_far greater than all cumulative adverse event reports to VAERS for the prior 30 years_**: an alarming statistic.

76.     This data is likely staggeringly underestimated, as past attempts to investigate VAERS reporting rate have suggested that between 1 percent and 13 percent of actual adverse effects get reported; however, because CDC changed VAERS reporting recently

---

[22] https://wonder.cdc.gov/controller/datarequest/D8;jsessionid=0E84A6725F6EA0434A7910838E0C; Josh Guetzhow, Safety Signals for COVID Vaccines Are Loud and Clear. Why Is Nobody Listening?, THE DEFENDER, (Sept. 29, 2021) available at https://childrenshealthdefense.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/ (last visited Oct. 2, 2021).

to include additional data, it is not possible to estimate the degree of underreporting based on past attempts to do so.[23] The CDC has failed to account for this underreporting.

77.        Recent estimates suggest that the rate of injury for vaccinated individuals is 5.1 percent.[24]

78.        COVID-19 vaccines have been known to cause a myriad of adverse effects: myocarditis, pericarditis, Guillain-Barre syndrome, antibody-dependent enhancement, fertility concerns, menstrual health issues, and many other conditions.

79.        Especially alarmingly high rates of myocarditis and pericarditis following vaccination have been witnessed in all age groups, but particularly in young males.[25] Stories of young athletes collapsing on the field due to heart problems have plagued the media. Because of underreporting, the risk of myocarditis following SARS-CoV-2 vaccination may be more serious than reported.

80.        Furthermore, spike proteins, the putative antigen induced by Pfizer-BioNTech COVID vaccine, are a toxin. They are produced and enter the circulatory system, have predictable negative consequences to vascular endothelium, activate platelets, and cross

---

[23] Varricchio F, Iskander J, Destefano F, Ball R, Pless R, Braun MM, Chen RT. Understanding vaccine safety information from the Vaccine Adverse Event Reporting System. Pediatr Infect Dis J. 2004 Apr;23(4):287-94. doi: 10.1097/00006454-200404000-00002. PMID: 15071280.

[24] *Horowitz: German insurance claims hint at millions of unreported COVID vaccine injuries*, August 15, 2022, available at https://www.conservativereview.com/horowitz-german-insurance-claims-vaccine-injury-2657863726.html.

[25] Krug A, Stevenson J, Høeg TB. BNT162b2 Vaccine-Associated Myo/Pericarditis in Adolescents: A Stratified Risk-Benefit Analysis. Eur J Clin Invest. 2022 May;52(5):e13759. doi: 10.1111/eci.13759. Epub 2022 Mar 4. PMID: 35156705; PMCID: PMC9111575; Gill J, Tashjian R, Autopsy Histopathologic Cardiac Findings in 2 Adolescents Following the Second COVID-19 Vaccine Dose. Arch Pathol Lab Med (2022); 146(8): 925-929. Doi: https://doi.org/10.5858/arpa.2021-0435-SA; Watanabe S, Hama R, SARS-CoV-2 vaccine and increased myocarditis mortality risk: a population based comparative study in Japan. Oct 18 2022, doi: https://doi.org/10.1101/2022.10.13.22281036.

the blood brain barrier. It would be expected to trigger the destruction of cells that produce it and present it on their surfaces.

81.     We now know that vaccine-induced spike proteins circulate throughout the body and accumulate in large concentrations in organs and tissues, including the spleen, bone marrow, liver, adrenal glands, and especially the ovaries.[26] Since there exists no way to turn off spike production, the actual dose of spike protein may vary by orders of magnitude from person to person. Strong but not yet conclusive evidence links spike protein *in vivo* to blood clots, thrombocytopenia, hemorrhages, heart attacks and strokes.

82.     The potential adverse effects Plaintiff faces in being coerced to receive the COVID-19 vaccines pursuant to Defendant's mandate are not theoretical, hypothetical or academic—they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the COVID-19 vaccines, subjecting Plaintiff to vaccination exposes her to a variety of health risks ranging from headaches and blood clots to death.

83.     The empirical evidence and recent studies have provided definitive proof that these vaccines cannot boast safety and effectiveness. In no such circumstances should these experimental medical products be mandated in any setting.

84.     Given these proven facts, which were accessible at the time that 3M implemented its vaccine mandate, Defendant knew or should have known that allowing Plaintiff to continue at her positions would not pose a risk or undue burden to 3M.

---

[26] Megan Redshaw, *'We Made a Big Mistake' – COVID Vaccine Spike Protein Travels From Injection Site, Can Cause Organ Damage,* The Defender (June 3, 2021), https://childrenshealthdefense.org/defender/covid-vaccine-spike-protein-travels-from-injection-site-organ-damage/.

**Employers Who Have Failed to Provide Reasonable Accommodations for
Vaccine Mandates Have Been Held Liable**

85.      The discouragement or denial of religious accommodations from employers'

mandatory vaccine policies has been found unlawful, even when those mandates were

proscribed by hospitals. Indeed, numerous employers have been sued and lost over forced

vaccines. *See, e.g. EEOC v. Mission Hosp. Inc*., No. 1:16-cv-118-MOC-DL, 2017 WL

3392783 (W.D.N.C. Aug. 2017) [resulting in permanent injunction against the employer

from improperly denying religious exemptions from mandated vaccines and requiring

employer to pay $89,000 in damages]; *United States v. Ozaukee County*, No

18-cv-343-pp (E.D. Wis. 2018) [resulting in a permanent injunction against the employer

for failure to grant religious exemptions from compulsory vaccines and order payment of

damages to employee].

86.      Likewise, in *EEOC v. Saint Vincent Health Center*, Civil Action No. 1:16-cv-234

(2016), the employer agreed to pay $300,000 to a class of six aggrieved former

employees and provided substantial injunctive relief to settle a religious discrimination

lawsuit based upon a failure to grant a religious exemption as part of a mandatory

seasonal flu vaccination requirement for its employees.

87.      Moreover, in *EEOC v. Memorial Healthcare*, Civil Action No. 2:18-cv-10523

(2018), the defendant employer paid $74,418 ($34,418 in back pay, $20,000 in

compensatory damages and $20,000 in punitive damages) for refusing to hire a medical

transcriptionist because of her religious beliefs against receiving flu shots and refusing to

accommodate those beliefs.

88.      In fact, as recently as 2018, the U.S. Equal Employment Opportunity Commission

sued Nashville-based Saint Thomas Health, after the employer failed to make a

reasonable religious accommodation for the flu vaccine. *EEOC v. Saint Thomas Health*, Civil Action No. 3:18-cv-00978 (M.D. Tenn. 2018).

89.  The *Saint Thomas Health* case resulted in a consent decree enjoining the employer from failing to provide religious accommodations to an employee's sincerely held religious beliefs unless such requests created an undue hardship. The decree also awarded the injured employee $75,000 in damages and directed the employer to issue the employee an apology letter.

90.  Indeed, on November 12, 2021, the U.S. Court of Appeals for the Fifth Circuit granted a stay of the Occupational Safety and Health Administration's nationwide vaccine mandate, stating that the mandate "raises serious constitutional concerns" and that "a denial of the petitioners' proposed stay would do them irreparable harm," as the Mandate threatens to substantially burden the liberty interest of reluctant individual recipients put to a choice between their job(s) and their jab(s)." BST Holdings v. OSHA, Order Granting Stay (U.S. Ct. App. 5th Cir.) (November 12, 2021). In implementing the mandate, the 5th Circuit concluded that OSHA likely "violates the constitutional structure that safeguards our collective liberty." *Ibid.*

91.  What is more, on November 21, 2021, the Honorable District Judge William LaFortune of the Tulsa County District Court granted the State of Oklahoma's application for a temporary restraining order against Ascension Healthcare, after the hospital rode roughshod over the religious rights of its employees by imposing a draconian vaccine mandate similar to 3M's. *O'Connor v. Ascension Healthcare*, Case. No. CJ-2021-3251 (Tulsa Cnty. Dist. Ct. 2021) (docket publicly accessible on OSCN.net); *See also O'Connor v. Ascension Healthcare*, Case No. 21-CV-488-TCK-SH (N.D. Okla. 2021)

(the Honorable Judge Kern remanding the case to Tulsa County District Court for further proceedings).

## **FIRST CAUSE OF ACTION**
### **Religious Discrimination**
### **[Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.]**

92.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

93.     Title VII prohibits "discriminat[ion] against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also EEOC v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768 (2015).[27]

94.     Title VII imposes upon an employer the duty to make reasonable accommodations for the religious observances short of incurring an undue hardship.

95.     Once an employee has established a prima facie case of discrimination, the burden shifts to the defendant to show that it could not reasonably accommodate the employee without undue hardship. *Maroko v. Werner Enterprises, Inc.*, 778 F. Supp. 2d 993 (D. Minn. 2011).

---

[27] As the Supreme Court has recognized, employees' "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit [legal] protection." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Additionally, though membership in or adherence to the tenets of an organized religion is plainly sufficient to provide protection for an individual's sincerely held religious beliefs, it is not a necessary precondition. *See Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989)

96.      Plaintiff asserted bona fide religious beliefs that conflicted with 3M's mandatory

vaccine policy and notified 3M of those beliefs by filing an exemption and

accommodation request per 3M's policies.

97.      Defendant 3M utterly failed to offer any reasonable accommodation, failed to

engage in the interactive process with Plaintiff, failed to perform an individualized

assessment of Plaintiff's request, and ultimately denied Plaintiff's religious exemption.

98.      Defendant took adverse employment action against Plaintiff by terminating

employment and forcing her to retire years early.

99.      By denying reasonable accommodation and executing punitive measures against

Plaintiff, Defendant discriminated against Plaintiff due to her religious beliefs.

100.      Defendant's failure to provide religious accommodations has substantially injured

Plaintiff. Plaintiff is under an employment contract forbidding her to work for a

competitor for two years.  Given the precise nature of the Plaintiff's job, only a

competitor would offer similar wages.  Plaintiff has been unemployed since being

terminated by 3M, on May 25. Plaintiff has suffered severe depression during this entire

time.

101.      On these facts, Plaintiff establishes a prima facie case that shows Defendant failed

to make any reasonable accommodation and violated Plaintiff's Title VII rights.

102.      Because Plaintiff will be able to establish a prima facie showing, the burden shifts

to Defendant to show that it could not accommodate the Plaintiffs' religious needs

without undue hardship. *Tepper,* at 514. Defendant is unable to make this showing for

several additional reasons.

103.     First, upon receiving Plaintiff's request for a religious accommodation, Defendant did not give that request the individualized consideration demanded by Title VII. In the EEOC's recent Technical Assistance, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (the "COVID-19 Technical Assistance", the EEOC addressed this precise issue.[28] In the COVID-19 Technical Assistance, the EEOC posed the following question: "Under Title VII, how should an employer respond to an employee who communicates that he . . . is unable to be vaccinated . . . because of a sincerely held religious belief." *Id*. at K.12. The EEOC's response was as follows:

> Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting the COVID-19 vaccine, the employer must provide a reasonable accommodation unless it would pose an undue hardship . . . . Under Title VII, an employer should thoroughly consider all possible reasonable accommodations . . . . In many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices, or observances.

*Id*. (emphasis added). Elsewhere in that document, the EEOC identified the types of reasonable accommodations employers must consider when they receive requests for religious accommodations, including "masks," "testing," "telework," "social distancing protocols," "making changes in the work environment (such as [modification] to ventilation systems or limiting contact with other employees and non-employees," and "regular hand washing." *Id*. at K.5.

104.     Here, Defendant failed to "thoroughly consider all possible reasonable accommodations," as required by the EEOC and provided a far cry from the "individualized" assessment required by the EEOC. *Id*. at K.5.

---

[28] *See* https://www.eeoc.gov/newsroom/eeoc-issues-updated-covid-19-technicalassistance, last visited on September 26, 2021.

105.      Second, Defendant cannot show that affording Plaintiff the types of accommodations the EEOC identified in the COVID-19 Technical Assistance as being reasonable in the context of employer vaccination policies—i.e., "masks," "testing," "telework," "social distancing protocols," "making changes in the work environment," "hand washing," etc.—would impose an undue hardship on it.

106.      Third, Plaintiff Holland had been exclusively working remotely. Plaintiff Holland therefore posed little to no threat of either catching or transmitting COVID-19 to or from fellow employees.

107.      Defendant cannot show that allowing Plaintiff to continue in her position as she had been successfully doing, let alone denying alternative reasonable accommodations such as masking, would have imposed an undue hardship.

108.       Fourth, evidence available at the time Plaintiff was terminated, reinforced by evidence that has come forth since, demonstrates that the COVID-19 vaccine is ineffective at preventing both infection and transmission. Declining to take the vaccine could therefore not cause any legitimate burden on 3M employees or its operation.

109.      As such, Defendant has violated Plaintiff's rights under Title VII by discriminating against them on the basis of her religious beliefs and failing to provide reasonable accommodation.

**SECOND CAUSE OF ACTION**
**Disability Discrimination**
**[Violation of the Americans with Disabilities Act; 42 U.S.C. § 12010 et seq.]**

110.      Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

21

111.     The Americans with Disabilities Act of 1990, set forth in 42 U.S.C. §§ 12010 et seq. (hereinafter the "ADA Act") prohibits any covered entity from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

112.     Under the ADA, an individual has a protected disability if he or she either has a "physical or mental impairment that substantially limits one or more major life activities …" (ADA Act, § 12102(1)(A)), or is: "*being regarded as having such an impairment* []." (*Id.,* at subparagraph (C)) (emphasis added).

113.     Under section 12102(3)(A) of the ADA Act: "An individual meets the requirement of 'being regarded as having such an impairment', if the individual establishes that he or she has been subjected to an action prohibited [by the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment substantially limits, or is perceived to substantially limit, a major life activity." (See also, 28 Code of Federal Regulations ("C.F.R.") §§ 35.108(f)(1) and 36.105(f)(1).)

114.     "An employer who fails to make 'reasonable accommodations to the known physical or mental limitations of an [employee] with a disability' discriminates '*unless*' the employer 'can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.' " *US Airways, Inc. v. Barnett,* 535 U.S. 391, 395 (2002) (quoting 42 U.S.C. § 12112(b)(5)(A)) (emphasis added). The burden of persuasion falls on the employer.

115.     An employer has a duty under the ADA to engage in an "interactive process" with the employee to determine whether, based on an *individualized assessment* of the employee's needs, a reasonable accommodation is possible.

116.     Defendant failed to engage in an interactive process with Plaintiff and to conduct an individualized assessment of her unique circumstances.

117.     3M discriminated against Plaintiff based on a perceived disability: being unvaccinated.

118.     Defendant regarded unvaccinated individuals as being "disabled" and unable to perform the duties of their employment.

119.     Based on this perceived disability, Defendant discriminated against Plaintiff by threatening termination if she failed to receive the COVID-19 vaccine, a "condition" regarded as a disability under 3M's policy.

120.      Plaintiff was constructively terminated due to her COVID-19 vaccination status, despite the fact that Plaintiff has successfully performed her same respective positions from which she was just removed since before COVID-19 was introduced to the world.

121.     By pattern and practice, virtually every employer in America has shown that reasonable accommodations and alternatives to vaccination indeed exist for employees, and these have been required all along since the inception of COVID: self-screening with temperature checks, wearing personal protective equipment (PPE), and complying with other various safety protocols until the number of COVID infections reduced to acceptable levels.

122.     Defendant cannot show that offering alternative, less-intrusive accommodations would cause an undue hardship, for the same reasons outlined in the context of Defendant's religious discrimination.

123.     Defendant's failure to provide accommodations has harmed and continues to harm Plaintiff.

124.     By failing to engage in the interactive process, offer any reasonable accommodation, and constructively terminating Plaintiff based on her medical decision, Defendant's discriminatory actions were in violation of the ADA.

### THIRD CAUSE OF ACTION
**Religious Discrimination**
**[Violation of the Georgia Human Relations Act; 43 P.S. § 955(a)]**

125.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

126.     The Georgia Human Relations Act declares that it is an unlawful practice for an employer "[t]o fail or refuse to hire, to discharge, or otherwise to discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of such individual's race, color, ***religion***, national origin, sex, disability, or age…" GA Code § 45-19-29(1) (emphasis added).

127.     "Religion" means all aspects of religious observance and practice as well as belief. GA Code § 45-19-22(7).

128.     Defendant is an "employer" as defined in GA Code § 45-19-22(5).

129.     Defendant has a duty to reasonably accommodate Plaintiff's religious observance or practice, absent an undue hardship on the conduct of Defendant's operation. GA Code § 45-19-22(4).

130.    Plaintiff asserted bona fide religious beliefs that conflicted with 3M's mandatory vaccine policy and notified 3M of those beliefs by filing an exemption and accommodation request per 3M's policies.

131.    Plaintiff offered numerous alternative accommodations such as regular testing, at her own expense, and the wearing of personal protective equipment, that would not infringe on her sincerely held religious beliefs but aimed to address 3M's concerns.

132.    Defendant 3M utterly failed to offer any reasonable accommodation, failed to engage in the interactive process with Plaintiff, failed to perform an individualized assessment of Plaintiff's request, and ultimately denied Plaintiff's religious exemption.

133.    Defendant took adverse employment action against Plaintiff by terminating employment and forcing Plaintiff to retire early.

134.    By denying reasonable accommodation and executing punitive measures against Plaintiff, Defendant discriminated against Plaintiffs due to their religious beliefs.

135.    Defendant's failure to provide religious accommodations has substantially injured Plaintiff.

136.    On these facts, Plaintiff establishes a prima facie case that shows Defendant failed to make any reasonable accommodation and violated Plaintiff's Title VII rights.

137.    Because Plaintiff will be able to establish a prima facie showing, the burden shifts to Defendant to show that it could not accommodate the Plaintiff's religious needs without undue hardship. *Tepper,* at 514. Defendant is unable to make this showing for several reasons.

138.    Defendant cannot show that allowing Plaintiff to continue in their positions as she had been successfully doing, let alone denying alternative reasonable accommodations such as masking, would have imposed an undue hardship.

139.    Fourth, evidence available at the time Plaintiff was terminated, reinforced by evidence that has come forth since, demonstrates that the COVID-19 vaccine is ineffective at preventing both infection and transmission. Declining to take the vaccine could therefore not cause any legitimate burden on 3M employees or its operation.

140.    As such, Defendant has violated Plaintiff's rights under Title VII by discriminating against her on the basis of her religious beliefs and failing to provide reasonable accommodation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for the following relief:

a.  A finding that Plaintiff has a fundamental right to her bodily autonomy, and to make health decisions in accordance with her beliefs and conscience.

b.  A finding that Defendant discriminated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act,  the Georgia Fair Employment Practices Act.

c.  Enjoin Defendant from taking any further adverse employment action against Plaintiff;

d.  Enjoin Defendant from taking any similar discriminatory adverse employment action against any other 3M employee;

e.  An order that Plaintiff be compensated, to the extent allowable under Georgia state and Federal law, for her monetary damages;

f.   An order that Defendant pays Plaintiff's costs associated with bringing this lawsuit, including her reasonable attorneys' fees and costs; and

g.   A grant of any such further relief as the Court deems necessary and proper in the public interest.

DATED: February 28, 2023

Respectfully submitted,

/s/ Jason H. Coffman
Jason H. Coffman
Law Office of Jason H. Coffman
Georgia Bar No. 173119
3280 Peachtree Road, NE, 7th Floor
Atlanta, GA
Telephone: (404) 581-3834
Email: jcoffman@jcoffmanlaw.com

Robert E. Barnes, Esq.
*Subject to admission pro hac vice*
235010/CA
Lexis Anderson, Esq.
*Subject to admission pro hac vice*
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510-6211
Facsimile: (310) 510-6225
Email: robertbarnes@barneslawllp.com

Counsel for Plaintiff *Julie Holland*

# EXHIBIT A

**Julie Holland**

| | |
|---|---|
| **From:** | Vaccine_Accommodation@mmm.com |
| **Sent:** | Thursday, October 28, 2021 9:20 AM |
| **To:** | Julie Holland |
| **Cc:** | vaccine_accommodation@mmm.com |
| **Subject:** | Religious Accommodation Follow Up Questions |



Dear Julie ,

Thank you for submitting your request for religious accommodation from the COVID-19 vaccination requirement.  We received your request on 10/21/2021.

We require additional information to evaluate your request.  The questions we need you to answer are listed below.

You are required to provide this information as soon as possible, and no later than 11/4/2021.  If you fail to provide any information as required by this letter, this may provide independent grounds to deny your accommodation request.

Thank you for your diligence and understanding as we work together to stay safe during this COVID-19 pandemic. If you have any questions or concerns, please do not hesitate to contact HR Help.

3M Vaccination Accommodations

**Please provide responses to all of the questions below:**

Is your belief that your body is a temple part of a religious doctrine in which you believe? If so, does it specifically reference vaccinations?
**Answer:**

How have you put your belief that your body is a temple into practice?
**Answer:**

What else besides the COVID vaccine do you refuse to put in your body as a result of your religious belief?
**Answer:**

Do you smoke? Do you drink alcohol? Take medications? If so, how is the COVID vaccine different? (We are not asking you to reveal which medications you are taking.)

# EXHIBIT B



Is your belief that your body is a temple part of a religious doctrine in which you believe? If so, does it specifically reference vaccinations?
**Answer: Exodus 15:26** – He said "If you listen carefully to the Lord your God and do what is right in his eyes, if you pay attention to his commands and keep all his decrees, I will not bring on you any of the diseases I brought on the Egyptians, for I am the Lord, who heals you"
I have prayed to the Lord My God for guidance on the covid vaccine and the Lord My God has expressly forbade it.   My sincerely held religious belief compels me to follow His word.

How have you put your belief that your body is a temple into practice?
**Answer:** I am willing to answer this but please help me understand your need for this information. The query seems excessive, in light of my Title VII protections.

What else besides the COVID vaccine do you refuse to put in your body as a result of your religious belief?
**Answer:** It is my understanding that this mandate is for the COVID vaccine specifically.  Does 3M intend to require additional medical interventions, vaccines, or procedures that I will have to adhere to as a condition of my employment? If so, please provide a comprehensive list and I will pray on each and every one of them and proceed as My Lord directs me.

Do you smoke? Do you drink alcohol? Take medications? If so, how is the COVID vaccine different? (We are not asking you to reveal which medications you are taking.)
**Answer:** Please help  me understand how this question has any bearing on my own God-required direction to not take the COVID vaccine?  Is the company planning to make smoking (or not), drinking (or not) and/or other medications a condition of employment?  If so, please let me know and I will pay on this and ask My Lord for guidance.  |

2nd set of questions.

# EXHIBIT C



June 18, 2022

**3M Total Rewards & Services**
3M Center, Building 0224-02-W-15
St. Paul, MN 55144-1000

JULIE O. HOLLAND
962 WOLFFORK CHURCH RD
RABUN GAP GA 30568-3019

Dear JULIE O. HOLLAND:

Congratulations on your retirement.  Your Honorary 3M Ambassador of Goodwill card is enclosed, personalized with your name, retirement date and years of 3M service.

This card is your permanent form of identification.  You can present this card to a security officer or receptionist at any of our 3M locations and arrangements will be made for you to tour or visit, within certain security limitations.  This privilege is extended to our 3M operations in countries outside the U.S. as well.

In addition, your Honorary 3M Ambassador of Goodwill card may be used to purchase merchandise at regular employee prices at any of 3M's employee stores or through the Employee Sales eStore at https://store.orderfront.com/3M/.

Please accept our sincere best wishes as you begin your retirement. If you have questions about your Honorary 3M Ambassador of Goodwill card, please call the 3M First Line at 1-888-611-5500.  If you have questions regarding your 3M retirement benefits you should access the Your Benefit Rewards Site at (digital.alight.com/3M) or if you do not have internet access available to you, call the 3M First Line.

EXHIBIT D

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Atlanta District Office**
100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
1-800-669-4000
Website:  www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 11/30/2022

**To:** Ms. Julie A. Holland
962 Wolffork Church Road
Rabun Gap, GA 30568

Charge No: 410-2022-08782

EEOC Representative and email:     Triet Bui
Federal Investigator
triet.bui@eeoc.gov

---

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 410-2022-08782.

On behalf of the Commission,

Digitally Signed By: Darrell Graham
11/30/2022

Darrell Graham
District Director

**Cc:**
Michael  Wilder
Littler Mendelson P.C.
2301 McGee Street, Suite 800
Kansas City, MO 64108

Robert  Barnes
Barnes Law, LLP
700 S Flowers St, Suite 1000
Los Angeles, CA 90017

Please retain this notice for your records.